Dweaine BOOKS, Plaintiff–Appellant,

v.

Shirley S. CHATER, Commissioner of Social Security, Defendant–Appellee.

No. 95–2794.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 19, 1996.

Decided Aug. 1, 1996.

Michael S. Sperling (argued), Milwaukee, WI, for Dweaine Books.

Thomas P. Schneider, Office of the U.S. Atty., Milwaukee, WI, Mary Thorson (argued), Dept. of Health and Human Services,

Region V, Office of the General Counsel, Chicago, IL, for Shirley S. Chater, Commissioner of Social Security.

Before POSNER, Chief Judge, and KANNE and ROVNER, Circuit Judges.

KANNE, Circuit Judge.

Since injuring his back, Dweaine Books has applied several times to the Social Security Administration for disability benefits, and each time he has been denied. After the most recent denial, and an administrative law judge's subsequent affirmance of that denial, Books filed suit in the Eastern District of Wisconsin seeking review of the administrative determination. Finding the ALJ's decision to be supported by substantial evidence, the district court granted summary judgment in favor of the Commissioner. Books now appeals to this court, and we affirm.

### I. HISTORY

Dweaine Books was born on June 28, 1937, and he attended school through part of the ninth grade. Books injured his back in December 1982 while on the job at Wisconsin Centrifugal Company, a foundry for which he had worked nearly twenty years. For the majority of those years, Books worked as a machine operator, running a turn lathe in the company's die shop. The job required heavy lifting, and Books had been injured while attempting to use chains and a hydraulic hoist to place a half-ton steel die into a lathe for machining.

After the injury, Books's internist, Dr. O'Mara, referred him to an orthopedist, Dr. Pruscha, and Books was admitted to the Memorial Hospital at Oconomowoc, Wisconsin. On April 27, 1983, Books underwent an epidural chymopapain injection. When the injection did not relieve his pain, Dr. Pruscha performed a lumbar laminectomy and diskectomy on June 14, 1983, during which herniated portions of two of Books's discs were removed.

On June 30, 1983, Books filed for disability insurance benefits, which were denied in November 1983. Books declined to appeal the denial and returned to work, this time as a chipper, a job requiring him to clean out machines and then shovel and haul heavy metal chips. However, in January of 1986, when a new owner took over Wisconsin Centrifugal, Books was laid off.

Books continued to complain of intermittent lower back pain—for example, in August 1986, while chopping wood and working around the house, he strained his lower back and was treated with Motrin. Books also complained of knee problems during the summer of 1987, and X-rays revealed minor degenerative changes in the joint. Dr. Pruscha instructed him to avoid excessive squatting and placed him on an isometric exercise program.

On May 7, 1987, Books again applied for a period of disability and for disability insurance benefits, which were again denied. He filed a timely request for review, and a hearing was held on April 15, 1988, before ALJ Eric J. Curtis. Written statements were obtained from Books's physicians, Drs. O'Mara and Pruscha. In a short statement, Dr. O'Mara expressed his belief that Books was "completely and permanently disabled because of his persistent back pain and degenerative arthritis to the right knee." Dr. Pruscha, on the other hand, submitted a full functional capacity evaluation, in which he opined: (1) that during an eight-hour day, Books would be able to walk, stand, and sit for two to four hours each; (2) that Books could safely lift up to twenty pounds frequently and up to fifty pounds occasionally; (3) that Books should avoid excessive or repeated bending; (4) that pushing and pulling should be performed only with proper body mechanics; (5) that whether and how often Books would require rest periods during the day would depend on his activity level; and (6) that with regard to his knee, Books had "a normal gait pattern" and "essentially no leg symptoms."

After the hearing, ALJ Curtis issued an opinion on July 28, 1988, affirming the SSA's denial of benefits. ALJ Curtis determined that Books was not engaged in substantial gainful employment and that he suffered from a severe impairment that prevented him from resuming the type of heavy lifting work he had previously performed while working for Wisconsin Centrifugal. In such cases, where the claimant can no longer per-

form his past work, the SSA's regulations require that factors including the claimant's age, education, and past work experience be considered along with his residual functional capacity to determine if he can perform some other job. 20 C.F.R. §§ 404.1520(f), 416.920(f). After reviewing all the evidence, ALJ Curtis determined that Books retained the residual capacity to perform a full range of unskilled "light work," as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), and therefore that he was not disabled within the meaning of the Social Security Act.

The following year, on January 30, 1989, Books filed for a period of disability, disability insurance benefits, and supplemental security income. His applications were denied by the SSA, both initially and on reconsideration, so on July 25, 1989, Books filed a request for a hearing. The hearing was scheduled for April 4, 1990, before ALJ Robert L. Bartelt, Jr.

In the interim, Books continued to visit Dr. O'Mara for the pain in his lower back and knee, and Dr. O'Mara referred him to a neurosurgeon, Dr. Lloyd. After examining Books on March 13, 1989, Dr. Lloyd reported his belief that Books might be experiencing "chronic low back and bilateral leg pain secondary to lumbar facet arthrosis." Dr. Lloyd ordered CT and bone scans, after which he noted some disc bulging in the lower back, as well as "[d]egenerative changes involving both knees and the right wrist." As treatment, Dr. Lloyd administered a lumbar facet injection of depo prednisolone and lidocaine. Unfortunately, Dr. Lloyd's findings do not include an estimation of the range of tasks Books could be expected to perform safely, nor an opinion as to the extent of Books's disability.

For use at the hearing before ALJ Bartelt, Dr. O'Mara completed a functional capacity evaluation of Books on February 26, 1990. Dr. O'Mara stated his belief that in an eight-hour workday, Books could only stand or sit for up to one hour each. He opined that Books could occasionally lift up to ten pounds, but he stated that Books was utterly incapable of lifting more than ten pounds, working above the shoulder level, bending, twisting, turning at the waist, squatting, crawling, climbing, pushing, or pulling. Dr. O'Mara concluded that because of the bulging disc in Books's lower back, as well as the arthritis in both his knees, Books was 100 percent disabled.

At the SSA's request, Books was also examined by Dr. Beaumont, a consulting physician, on May 18, 1990. Dr. Beaumont noted that Books suffered from pains in his lower back, left knee, and right wrist resulting from osteoarthritis, degenerative changes in the patellofemoral joints, and moderate arthritic changes of the radial carpal joint, respectively. He also diagnosed obesity, hypertension, mild depression, and a variety of other minor afflictions. Dr. Beaumont reported that "[Books] seems to have some difficulty squatting and lifting, however [he] seems to be able to stand and walk and grasp without much difficulty. [Books's] overall condition could be significantly improved if [he] would lose weight to ideal body weight and get into a regular disciplined exercise program." As for functional capacity, Dr. Beaumont concluded that Books could lift up to ten pounds frequently and twenty pounds occasionally. He further determined that in an eight-hour workday, Books would be able to sit for five hours and for up to forty-five minutes at a time, stand for six hours and for up to one hour at a time, and walk for four hours and for up to one-half hour at a time.

At the hearing before ALJ Bartelt, Books testified that he lived in constant pain. He explained that due to his lower back pain, he had difficulty climbing the stairs to his second-floor apartment, his back stiffened up after only twenty minutes in a car, he had difficulty putting on his clothes and shoes in the morning, and he had trouble sleeping in his bed at night, often having to lie on the floor to straighten his back out. Books stated that he could stand for only ten to fifteen minutes at a time, could sit for only forty-five minutes at a time, and had to lie down for two to three hours a day to alleviate his pain. He complained that his knees would give out after walking only half a block and that his wrist pain gave him trouble when lifting even the lightest items, such as a glass of milk. He also testified that he often felt dizzy and had trouble remembering or concentrating,

which hindered his ability to have conversations and to read (which he said he did extensively). He complained of anxiety, nervousness, and depression, and explained that he rarely left his room.

Despite this bleak testimony, Books also testified that he did not take any serious prescription pain medication (he takes three relatively mild painkillers) and that he did not participate in physical therapy for either his back or his knees. He testified that he did some household chores, prepared his meals, shopped for groceries, attended church twice a week, visited with his family and friends, and occasionally drove his car. Books's brother also testified at the hearing, and he substantially reiterated Books's testimony concerning his activities and limitations.

In an opinion dated February 20, 1991, ALJ Bartelt issued his decision affirming the SSA's denial of benefits. ALJ Bartelt first noted that in the July 28, 1988, opinion, ALJ Curtis had found that Books retained the residual functional capacity to perform a full range of light work. Due to principles of preclusion, ALJ Bartelt held that for purposes of the present claim, Books was on July 28, 1988, capable of performing light work. Thus, in order for Books to prevail on the question of whether he became disabled after July 28, 1988, the evidence would have to demonstrate that his condition had significantly deteriorated since that date.

Looking to the medical evidence, ALJ Bartelt declined to give much weight to Dr. O'Mara's findings. Dr. O'Mara had claimed at the time of ALJ Curtis's 1988 decision that Books was "permanently disabled," and ALJ Bartelt determined that Dr. O'Mara's continued protestations of Books's 100 percent disability were "not supported by any documented clinical testing or other objective medical findings from which one could reasonably conclude that there had been a deterioration in [Books's] condition." ALJ Bartelt's decision instead points to the conclusions of Dr. Beaumont, which ALJ Bartelt felt were consistent with the earlier findings of Dr. Pruscha and, thus, demonstrated that Books's condition had not significantly changed for the worse.

Turning to Books's testimony, ALJ Bartelt admitted that Books was severely impaired and could not perform heavy labor like that which he had done while working for Wisconsin Centrifugal. Nevertheless, ALJ Bartelt determined that Books's testimony concerning his daily activities (including household chores, preparing meals, shopping, driving, attending church, and visiting with family and friends) and his failure to take strong continuing measures to treat his pain (which might include potent pain medicine, physical therapy, reducing his weight, or utilizing a TENS unit), in light of the medical findings of Dr. Beaumont (which were consistent with Dr. Pruscha's and thus indicated that Books's condition had not substantially deteriorated), did not support Books's claims that he could no longer perform light work. As a result of his determination that Books retained the residual capacity to perform the regular requirements of unskilled light work, ALJ Bartelt held that Books was not disabled within the meaning of the Social Security Act and affirmed the SSA's denial of benefits.

Within the required sixty-day period, Books requested the Appeals Council to review ALJ Bartelt's decision. Upon their review, the Appeals Council determined that the medical evidence did not support ALJ Bartelt's determination that Books could perform the *full range* of unskilled light labor. Rather, the evidence demonstrated that Books could perform light work, but indicated that he could not remain either sitting or standing for extended periods of time during the workday. Thus, Books's employment opportunities were limited to those light jobs where he would have the option to change his position between sitting and standing at will—i.e., light work with a sit/stand option. Relevant to this determination, Social Security Ruling 83–12 provides in relevant part:

> In some disability claims, the medical facts lead to an assessment of [residual functional capacity] which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting. Such

an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work....

... [M]ost jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit or stand, a V[ocational] S[pecialist] should be consulted to clarify the implications for the occupational base.

SSR 83–12, 1983 WL 31253, at *4 (SSA). As a result, the Appeals Council vacated ALJ Bartelt's decision and remanded the case for consideration of whether, in spite of his ability to perform light work, Books was disabled because he could only work in a situation where he had the ability to sit or stand at will. Consistent with the mandate of SSR 83–12, the Appeals Council instructed ALJ Bartelt to obtain expert testimony from a vocational specialist concerning whether a substantial number of potential unskilled employment opportunities exist for an individual who is restricted to performing light work with a sit/stand option.

A supplemental hearing was held to hear testimony from Maude Prall, a vocational specialist. At the hearing, ALJ Bartelt posed a hypothetical to Prall describing an individual with Books's age, education, and experience who was subject to the functional capacity limitations described by Dr. Pruscha, as well as the need to alternate sitting and standing at will. Prall testified that there were 10,500 jobs in the state that could be performed by such a person, examples including work as a security guard, an arcade attendant, a quality inspector, or a parking lot attendant. She stated that all 10,500 jobs were unskilled, required no more than light exertion, and provided a sit/stand option. ALJ Bartelt posited a second hypothetical describing the same individual with the limitations identified by Dr. Beaumont, including

the need to alternate sitting and standing at will. Prall testified that such an individual could perform the same 10,500 jobs she had identified in response to the first hypothetical. Finally, Books's counsel offered Prall the hypothetical of a person with the limitations described by Dr. O'Mara, and Prall testified that she knew of no jobs that such an individual could perform.

On the basis of this testimony, ALJ Bartelt determined that a significant number of jobs existed in the employment marketplace that could accommodate an individual who is limited to performing light work and who requires a sit/stand option. Given that both he and the Appeals Council had found that Books retained the residual capacity to engage in light work with a sit/stand option, ALJ Bartelt accordingly held that Books is not disabled within the meaning of the Social Security Act, and he again affirmed the SSA's denial of benefits.

Books brought an action in district court, seeking review of the final administrative decision, and both parties consented to entry of final judgment by a magistrate judge. On June 27, 1995, by order of the magistrate judge, the district court entered summary judgment in favor of the Commissioner, affirming the administrative decision. Books now appeals to this court, arguing that ALJ Bartelt's decision that Books is not disabled was not supported by substantial evidence.

## II. ANALYSIS

■ Books challenges ALJ Bartelt's determination that he retained the residual capacity to perform light work with a sit/stand option and that a significant number of jobs existed that could be performed by an individual with such limitations. Title 42 of the United States Code, § 405(g) instructs that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...." 42 U.S.C. § 405(g). Thus, the question before us is not whether Books is, in fact, disabled, but whether ALJ Bartelt's findings were supported by substantial evidence. *Diaz v. Chater,* 55 F.3d 300, 306 (7th Cir. 1995). The Supreme Court has defined substantial evidence as "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether Books is disabled, we must affirm the ALJ's decision denying benefits.

Before turning to Books's arguments on appeal, we address a slight procedural wrinkle. In the district court order entering judgment in favor of the defendant, the magistrate judge stated: "Following oral argument, and for the reasons stated on the record, the court found that the decision of the Secretary is supported by substantial evidence." Unfortunately, a recording device, rather than a court reporter, was employed to memorialize the proceedings before the magistrate judge. Due to a technical difficulty with this recording mechanism, the magistrate judge's oral findings were not preserved and, thus, could not be made part of the record on appeal. The magistrate judge made no written findings. As a result, we have received a record devoid of any district court findings of fact or law; the judgment of the district court is simply announced without rationale.

FED.R.CIV.P. 52(a) requires the district court to make explicit findings of fact and conclusions of law "[i]n all actions tried upon the facts without a jury or with an advisory jury...." Rule 52(a) expressly excludes from this requirement where a district court disposes of an action upon a motion, including a dismissal under Rule 12 or the entry of summary judgment under Rule 56, presumably because appellate review of such dispositions is *de novo.* FED.R.CIV.P. 52(a). Nevertheless, our Circuit Rule 50 expands the district court's obligation to make explicit findings to include "[w]henever a district court resolves any claim or counterclaim on the merits, terminates the litigation in its court, or enters an interlocutory order that may be appealed to the court of appeals ...." 7th CIR.R. 50. Circuit Rule 50's sweeping language expressly encompasses the decision below because the magistrate judge entered judgment for the Commissioner on the merits of Books's claim.

■ By virtue of Circuit Rule 50, even in cases where our review is plenary, a record lacking stated reasons for the district court's decision would ordinarily lead us to remand the case for the development of a more useful record. *Pasquino v. Prather,* 13 F.3d 1049, 1050–51 (7th Cir.1994); *DiLeo v. Ernst & Young,* 901 F.2d 624, 626 (7th Cir.), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). However, in some cases where, as here, the correct resolution of the appeal is fairly clear, "[a] remand would prolong the case without contributing to accurate resolution." *DiLeo,* 901 F.2d at 626. Accordingly, although we would prefer a more complete record of the magistrate judge's findings, we elect to proceed directly to the merits "in order to spare both the parties and the court gratuitous travail." *Id.*

A. Medical Testimony

Books argues first that ALJ Bartelt's decision is unsupported by substantial evidence because it runs contrary to the relevant medical evidence in the record. Books asserts that the findings of Drs. O'Mara and Lloyd support his claims of disability, and he argues that ALJ Bartelt erred by discarding this evidence and relying instead on the opinion of Dr. Beaumont.

We begin by noting that Dr. Lloyd's findings are equivocal and therefore not particularly supportive of either side in this controversy. It is true that Dr. Lloyd found Books to be suffering from "chronic low back and bilateral leg pain secondary to lumbar facet arthrosis," as well as "[d]egenerative changes involving both knees and the right wrist." However, neither ALJ Bartelt nor the SSA disputes that Books's afflictions are a serious impairment. The question to be resolved at the hearing was whether, despite his serious injuries, Books retains the residual functional capacity to find some gainful employment in the marketplace. Given that Dr. Lloyd failed to venture an opinion as to the extent of Books's limitations or as to his residual capabilities, the evidentiary usefulness of his findings is slight, at best.

Thus, with respect to relevant medical opinions, ALJ Bartelt was left with the find-

ings of Dr. O'Mara and of Dr. Beaumont (whose observations were quite similar to those of Dr. Pruscha in 1988). ALJ Bartelt found Dr. O'Mara's opinion to be not credible, and thus declined to accord it much weight. Dr. O'Mara had proclaimed Books's total disability since mid-1988 when Books was found by ALJ Curtis capable of performing light work, and ALJ Bartelt determined that Dr. O'Mara's 1992 opinion was "not supported by any documented clinical testing or other objective medical findings from which one could reasonably conclude that there had been a deterioration in [Books's] condition [since 1988]." ALJ Bartelt instead relied upon the findings of Dr. Beaumont to find that Books's condition had not seriously deteriorated since 1988 and, thus, that he remained capable of performing light work with a sit/stand option.

■ In assessing conflicting medical opinion evidence, ALJs must consider a variety of factors, including whether a physician is a treating or examining physician; the length, nature, and extent of the treatment relationship; the physician's specialty; and the consistency and supportability of the physician's opinion. 20 C.F.R. §§ 404.1527(a)–(d), 416.927(a)–(d). When evaluating a conflict between the opinions of treating and consulting physicians, we have held that "the ALJ must take into account the treating physician's ability to observe the claimant over a longer period." *Stephens v. Heckler*, 766 F.2d 284 (7th Cir.1985). However, "while the treating physician's opinion is important, it is not the final word on a claimant's disability." *Reynolds v. Bowen*, 844 F.2d 451 (7th Cir.1988). We have noted:

> The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability. The regular physician also may lack an appreciation of how one case compares with other related cases. A consulting physician may bring both impartiality and expertise.

*Stephens*, 766 F.2d at 289. Thus, in the end, "it is up to the ALJ to decide which doctor to believe—the treating physician who has experience and knowledge of the case, but may be biased, or ... the consulting physician, who may bring expertise and knowledge of

similar cases—subject only to the requirement that the ALJ's decision be supported by substantial evidence." *Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir.1992).

■ Mindful of these considerations, we find ALJ Bartelt's appraisal of Dr. O'Mara's findings to be perfectly reasonable based on the evidence in the record. In light of the striking conflict between the 1988 opinion of Dr. O'Mara and the findings of Dr. Pruscha that ALJ Curtis relied upon, ALJ Bartelt was entitled to view Dr. O'Mara's subsequent opinions of disability (which did not rest upon any medical evidence demonstrating a significant deterioration in Books's condition) with some skepticism.

Nevertheless, Books argues, citing *Micus v. Bowen*, that it is error for an ALJ to reject the opinion of a treating physician in favor of a consulting physician that has examined the patient only once. His argument is unpersuasive. In *Micus*, the ALJ was asked to determine the extent of the claimant's disability from 1977 to 1983, when her insurance coverage under the Act expired. *Id.* at 604. The treating physician for the relevant period of years opined that the claimant had been disabled during that time, but the ALJ relied on the contrary opinion of a physician who had treated the claimant only once, during 1985, and thus had "merely speculated as to her past condition." *Id.* at 606–07. In reversing the district court's affirmance of the ALJ's decision, this court took care to distinguish the facts of *Micus* from earlier cases, such as *Stephens*:

> [T]he issue in *Micus* revolves around her past condition; in *Stephens*, the issue was the claimant's present condition. Whereas scores of doctors may examine a claimant's present condition, going back in time to examine the claimant's past condition is difficult for even the most talented physician. In such a case, the ALJ must take into account the treating physician's ability to observe the patient.

*Id.* at 608. Here, unlike in *Micus*, Dr. Beaumont's findings concerned Books's condition at the time of his examination. Nothing in *Micus* mandates that the opinion of a treating physician always be accepted over that of a consulting physician, only that the relative merits of both be duly considered. Given that Dr. Pruscha had found Books to possess

the residual capacity to perform light work in 1988, and Dr. Beaumont's findings were essentially consistent with those of Dr. Pruscha—while Dr. O'Mara proclaimed Books's utter disability throughout, unsupported by tangible evidence of any significant deterioration in Books's condition—ALJ Bartelt was justified in rejecting Dr. O'Mara's findings and relying instead on the opinion of Dr. Beaumont.

### B. Roland Books's Testimony

■ Books next contends that we must reverse because the ALJ declined in its written opinion to specifically address the testimony of Books's brother, Roland. However, "[w]e have repeatedly stated that the ALJ need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir.1993) (per curiam) (citing *Stephens,* 766 F.2d at 287; *Zblewski v. Schweiker,* 732 F.2d 75, 79 (7th Cir.1984)). All we require is "that the ALJ sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson,* 999 F.2d at 181 (quoting *Stephens,* 766 F.2d at 287).

In *Carlson v. Shalala,* the plaintiff, Carlson, raised essentially the same challenge that Books brings here. 999 F.2d at 181. Carlson objected to the ALJ's failure to discuss specifically in the opinion the testimony of his wife, which had "essentially corroborated Carlson's account of his pain and daily activities." *Id.* We rejected Carlson's argument, explaining that "[i]f the ALJ were to ignore an entire line of evidence, that would fall below the minimal level of articulation required," *id.* (citing *Zblewski,* 732 F.2d at 78–79), but finding that Carlson's was not such a case because in light of his own testimony, his wife's description of his limitations and activities "was essentially redundant." *Id.*

■ The same is true in this case. Books's brother Roland's testimony did not constitute a separate "line of evidence." Rather, it served strictly to reiterate, and thereby corroborate, Books's own testimony concerning his activities and limitations. To the extent ALJ Bartelt found Books's testimony concerning his disabling pain and physical limitations to be untenable when contrasted with his reported daily activities and the relevant medical evidence, he necessarily found Roland Books's supporting testimony similarly not credible. ALJ Bartelt, therefore, did not err by declining to address Roland's testimony specifically.

### C. Vocational Expert's Testimony

Lastly, Books raises two challenges to ALJ Bartelt's reliance on the vocational expert's testimony that there existed a significant number of jobs that could accommodate an individual with Books's age, education, experience, and functional capacity limitations. First, Books argues that despite Prall's testimony, SSR 83–12 precludes a finding of the existence of unskilled light jobs that afford an employee the option to sit or stand at will. He points to language in the ruling stating:

[M]ost jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will.

SSR 83–12, 1983 WL 31253, at *4. From this, Books maintains that the SSA has already determined the nonexistence of unskilled light labor with a sit/stand option.

■ But the language Books cites is immediately followed by the SSA's directive that "[i]n cases of unusual limitation of ability to sit or stand, a V[ocational] S[pecialist] should be consulted to clarify the implications for the occupational base." *Id.* Thus, SSR 83–12 does not endeavor to decide that there can *never* exist significant light jobs with a sit/stand option. Rather, it notes that one cannot assume that individuals limited to light work with a sit/stand option can perform the full range of light jobs because many, if not most, light jobs do not afford an employee the option to sit or stand at will. It accordingly directs the SSA in such cases to obtain the testimony of a vocational specialist concerning whether significant light jobs exist that could accommodate the claimant's special limitations. That is precisely what ALJ Bartelt did here in procuring Prall's testimony at the supplemental hearing. After Prall testified to the existence in the relevant employment market of a signifi-

cant number of light jobs with a sit/stand option, ALJ Bartelt was entirely justified in relying upon her testimony to find that Books was not disabled within the meaning of the Social Security Act.

 Second, Books contends that ALJ Bartelt erred in relying on Prall's testimony as evidence of the existence of jobs that could accommodate Books's limitations because the hypotheticals posed to her did not include Books's need to lie down for significant periods of time during the day. Books argues that his need to lie down for hours at a time is supported not only by Dr. O'Mara's findings and by Roland's and his testimony (all of which ALJ Bartelt found to be not credible), but by the findings of Drs. Pruscha and Beaumont (upon which ALJ Bartelt relied) as well. This argument, however, proves to require quite a stretch of the evidence.

Dr. Pruscha's 1988 functional evaluation noted that Books's need for rest periods during the workday would depend upon his level of activity and exertion. Books maintains that this statement is strong support for his claim that he must spend a significant portion of the day in either a prone or supine position. But contrary to Books's contention, nothing in Dr. Pruscha's functional capacity evaluation indicates that "rest periods" refers to lying down. ALJ Bartelt could have reasonably interpreted Dr. Pruscha's statement as evidence that during periods of activity or exertion—e.g., pushing, pulling, or lifting light weights, or walking for an extended period—Books would have to stop and rest by briefly ceasing the activity or perhaps by sitting down. There is no specific indication in Dr. Pruscha's findings that Books would ever need to lie down for any length of time during an average workday. Even if one were to assume that by "rest periods," Dr. Pruscha meant lying down, his findings do not indicate at what activity or exertion level Books would require any rest periods at all, how long such periods would last if required, nor how frequently rest periods would be necessary.

As for Dr. Beaumont, Books points to the "Comments" section of Dr. Beaumont's observation report, where he noted:

> This claimant is alleging symptoms that seem to be in proportion to my objective

findings, however no evidence of enlargement, fusion, heat, swelling, instability, deformity except for left bicep and some tenderness over both wrists. Strength appears to be normal for patient's overall condition. No evidence of muscle spasm, atrophy, motor or sensory reflex changes. Patient seems to have some difficulty in squatting and lifting, however seems to be able to stand and walk and grasp without much difficulty.

Books argues that Dr. Beaumont's statement that Books's complained-of symptoms seemed to be in proportion to his objective findings constitutes a blanket validation of all of Books's testimony, including his need to lie down. We cannot accept Books's urged interpretation of Dr. Beaumont's report. Not only is the statement Books points to subsequently qualified, but it would have been unreasonable for the ALJ to read this single offhanded remark as a renouncement of the remainder of Dr. Beaumont's report and a wholesale endorsement of Books's claims.

The judgment of the district court is hereby AFFIRMED.