Mary Ella TOWNSEND and Rachel
Townsend, Plaintiffs,

v.

Kenneth S. APFEL, Commissioner of
Social Security, Defendants.[1]

No. 98 C 4881.

United States District Court,
N.D. Illinois,
Eastern Division.

April 27, 1999.

1. Townsend improperly named Donna Shalala, the Secretary of Health and Human Services, as a defendant in her complaint. We dismiss the complaint as to Ms. Shalala.

James Thomas Derico, Jr., Derico & Associates, P.C., Chicago, IL, for Mary Ella Townsend and Rachel Townsend, plaintiffs.

Sherri Thornton, United States Attorney's Office, Chicago, IL, for Donna Shalala, Secretary of Health and Human Services and Kenneth Apfel, defendants.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Mary Ella Townsend appeals the Social Security Administration's final decision denying her application for Disabled Adult Child Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 402(d)(1), 423(d), 1383(c)(3). Townsend claimed that

a schizotypal personality disorder, learning disability, and plexiform neurofibroma made her unable to sustain any gainful employment. The Administrative Law Judge concluded that none of Townsend's impairments met or equaled in severity those impairments presumed to result in disability under the Social Security Act, and furthermore, that jobs exist in the national economy that Townsend could perform. Currently before this Court is Townsend's motion for summary judgment.[2] Because the administrative decision is adequately supported by substantial evidence contained in the record and the ALJ properly applied step five of the Administration's disability determination analysis, we must deny Townsend's motion for summary judgment.

## BACKGROUND

### I. The Evidence Contained in the Administrative Record

Mary Ella Townsend was twenty-one years old at the time of the ALJ's decision in September 1997. (R. at 44, Tr. of 6/4/97, at 5 ("Tr.").)[3] In 1995, Townsend graduated from high school where she was enrolled in the special education program. At the time of her hearing, Townsend had approximately one week left in a vocational training program, where she learned to assemble lightweight products. Townsend has never been gainfully employed. (R. at 46–48, 61–63, Tr. at 7–9, 22–24.)

In May 1995, Townsend applied for SSI alleging a disability based on an emotional disturbance. Later, she added claims for a physical disability and learning disorder. A hearing before an ALJ was held in June 1997. Based on the medical record and testimony at the hearing, the ALJ conclud-

ed that Townsend was not "disabled" as defined by the Social Security Act and that she could perform a large number of available jobs. Consequently, the ALJ denied Townsend's applications for benefits. The Appeals Council denied review and Townsend filed this lawsuit. Because this Court reviews the ALJ's decision for substantial evidence, we now examine the record facts in detail.

### A. Mental Impairment

Townsend claims that she became disabled in June 1990 because of an emotional disturbance. (R. at 84, SSI Notice at 1.) In February 1996, Dr. Charles S. Fox performed a psychiatric evaluation of Townsend in connection with her SSI application, and concluded that she had no diagnosable psychiatric illnesses. (R. at 263, Fox Report at 3.) In January 1997, however, Dr. William Burwell, a clinical psychologist, evaluated Townsend and diagnosed her with a schizotypal personality disorder and borderline intellectual functioning. (R. at 277, Burwell Report at 5.)

Dr. Burwell administered an IQ test to Townsend on which she scored 78 verbal IQ; 80 performance IQ; and 77 full-scale IQ. (R. at 275, Burwell Report at 3.) Townsend's quotients were in the "borderline, low average, and borderline range of intelligence, respectively, for her age group." (R. at 275, Burwell Report at 3.) Dr. Burwell reported that Townsend's subtest scores indicated difficulty in the following areas: vocabulary skills; math/computational skills; and practical judgment. (R. at 275, Burwell Report at 6.) Townsend exhibited higher subtest scores in visual concentration, social judgment, and verbally-mediated concept formation. (R. at 275, Burwell Report at 3.)

---

**2.** Townsend's reply brief was due March 12, 1999. She did not file the reply, but on March 23 requested an extension in which to do so. We granted an extension until April 23. It is now April 27 and Townsend has not replied. We therefore must decide this case without the benefit of Townsend's responses to the Commissioner's arguments.

**3.** We cite both the consecutively paginated administrative record (R. at ___) and the individual document contained in that record, (Tr. at ___).

Dr. Burwell also performed a personality evaluation of Townsend. He reported that Townsend "is a fearful sort," is socially isolated and unkempt, has a poor self-image, tends to fantasize, and is xenophobic. (R. at 276–277, Burwell Report at 4–5.) Although Dr. Burwell found Townsend to be "friendly and cooperative," he also opined that she was "somewhat odd and her practical judgment [wa]s questionable." (R. at 278, Burwell Report at 6.) During the evaluation, Townsend discussed her "dream" and "preoccupation with an asteroid ending the world in 2000." (R. at 278, Burwell Report at 6.) Dr. Burwell concluded that, although Townsend was not currently psychotic, (R. at 277, Burwell Report at 5), "stressful occupations should be avoided as they could lead to a psychotic decompensation." (R. at 279, Burwell Report at 7).

Townsend's mother, Rachel, testified that in second grade Townsend's school classified her as emotionally disturbed based on her fear of being alone. (R. at 66–67, Tr. at 27–28.) Rachel testified that her daughter usually needs someone to show her how to do things, but that once taught, Townsend could "follow through on her own." (R. at 67, Tr. at 28.) Furthermore, Rachel explained that her daughter has problems with reading comprehension and verbal expression. (R. at 68, Tr. at 29.) Townsend's brother, Joseph, corroborated Rachel's testimony: "[Mary Townsend is] willing to learn [and] do whatever it is that she can to better herself" but that she "needs to be spoon fed everything ... meaning that somebody would have to do it alongside of her for a while, and then, she'll attempt to go on independently." (R. at 71–72, Tr. at 32–33.) He also attributed Townsend's emotional problems to prior abuse. Specifically, Joseph testified that she was raped by her classmates in kindergarten and that a mugger recently put a gun to her head. (R. at 71, Tr. at 32.)

Dr. Norman G. Kerr, a licensed clinical psychologist, testified at the hearing as a medical expert. Dr. Kerr did not examine Townsend, but did review Townsend's medical record and considered testimony that he heard during the administrative hearing. On this basis, Dr. Kerr concluded that Townsend has a schizotypal personality disorder. (R. at 73, Tr. at 34.) Dr. Kerr explained that the disorder is manifested by Townsend's extremely dependent and clinging behavior, her fear of separation, her lack of basic skills, and her inability to make everyday decisions. (R. at 73, Tr. at 34.) However, Dr. Kerr also stated that Townsend's schizotypal disorder is symptomatically moderate and, therefore, does not meet Listing 12.08 (personality disorders) even when considered in combination with her other impairments. (R. at 74, Tr. at 35.) In addition, Dr. Kerr testified that Townsend's seventh-grade reading level demonstrates only a mild learning disability given her age. (R. at 74, Tr. at 35.)

### B. Physical Impairment

In July 1995, Dr. Mark D. Talamonti, Townsend's attending physician, performed a repeat biopsy of a mass found in Townsend's right shoulder and arm area. (R. at 189, Pathology Report at 1.) He diagnosed plexiform neurofibroma and concluded that Townsend would need an operation to remove the mass. (R. at 220, Talamonti Progress Notes at 1.) In November 1995, Dr. Talamonti surgically removed the non-cancerous tumor from Townsend's right shoulder. (R. at 204–205, Talamonti Procedure Report at 1–2.)

Dr. Talamonti also suspected that Townsend might have von Recklinghausen's disease[4] and referred her to a neurologist, Dr. Jack Rozenthal. (R. at 240, Letter

4. Von Recklinghausen's disease, or neurofibromatosis, is "a genetically transmitted disease in which many soft, fleshy growths of abnormal nerve tissue (neurofibromas) appear in the skin and other parts of the body." The Merck Manual of Medical Information 384 (Home Ed.1997).

from Talamonti to Rozenthal of 12/6/95, at 2.) The record does not reveal what became of the referral. Later, Dr. Talamonti completed a residual functional capacity assessment of Townsend in which he opined that she had "clinical neurologic deficits." (R. at 316, Talamonti Report at 3.) Dr. Talamonti does not elaborate on this opinion and the record contains no further evidence that Townsend has either von Recklinghausen's disease or some other neurological impairment.

Dr. Henry Bernet also prepared a residual functional capacity assessment of Townsend. (R. at 253, Bernet Residual Functional Capacity Assessment ("RFC") at 1.) Although Dr. Bernet found that Townsend is "essentially a one-armed individual," he reported that she could occasionally lift or carry 20 pounds, frequently lift and or carry 10 pounds, stand and or walk for a total of about 6 hours in an 8–hour workday, sit for a total of about 6 hours in an 8–hour workday, but that she could not push or pull. (R. at 254, Bernet RFC at 2.) He recommended that Townsend avoid working with machinery requiring the use of both hands or both arms. (R. at 257, Bernet RFC at 5.)

Dr. Bernet's assessment of Townsend's residual functional capacity differs somewhat from that of Dr. Talamonti. For example, Dr. Talamonti opined that Townsend should be restricted to standing or walking for 4 hours or 1 hour without interruption, (R. at 315, Talamonti Report at 2), but Dr. Bernet reported that Townsend could stand or walk for approximately 6 hours, (R. at 254, Bernet RFC at 2); and whereas Dr. Talamonti stated that Townsend's ability to sit was unimpaired, (R. at 315, Talamonti Report at 2), Dr. Bernet contended that Townsend could sit for about 6 hours. (R. at 254, Bernet RFC at 2.) Moreover, Dr. Talamonti noted that Townsend could stoop and crouch occasionally, but that she could never kneel or crawl. (R. at 315, Talamonti Report at 2.) In contrast, Dr. Bernet did not specify any postural limitations regarding Townsend's ability to stoop, crouch, kneel, or crawl. (R. at 254, Bernet RFC at 3.)

At the hearing, Townsend, who is left-handed, testified that her right arm still hurt from the surgery. Moreover, she said that her work at the vocational program was affected by the pain. (R. at 48, Tr. at 9.) However, Townsend testified that before she started participating in the vocational rehabilitation program (but after the operation), she played video games, drew, played piano, and visited her friends. (R. at 49–50, Tr. at 10–11.) Townsend also reported doing some housework: she occasionally mops and regularly takes out the garbage. (R. at 55, Tr. at 15.)

As to the vocational program, Townsend testified that she has difficulty standing or sitting for long periods of time due to pains in her shoulder, back, and right foot. (R. at 51, Tr. at 20.) Additionally, Rachel testified that "since [Mary's] had this particular training program, she's been complaining about a lot of pain." (R. at 68, Tr. at 29.) Rachel also testified that Mary has difficulty dressing herself and untying her shoes, especially when her right arm is hurting. (R. at 68–69, Tr. at 29–30.)

## C. Vocational Expert's Testimony

Grace Gianforte, a vocational expert, testified at Townsend's administrative hearing. The ALJ asked Gianforte to comment on the kind of work a hypothetical individual similarly situated to Townsend could perform. In addition to identifying Townsend's educational background, age, and lack of work experience, the ALJ proposed a hypothetical person with the same impairments and limitations he found in Townsend:

> [The individual is] capable of light exertional work, occasionally could lift 20 pounds, frequently could handle up to ten pounds; [sic] if that person was, by virtue of the pain syndrome and residuals of the problem with the upper extremity; [sic] capable of only sit/stand option type work; and was restricted to the use of the right [arm] for assist

purposes only; would—is precluded from the use of the right [arm] in the operation of any machinery or equipment that would require the use of both the right and left [arms] to operate it[sic] safely and properly; and would be limited to unskilled, simple tasks.... Oh, one other restriction, too: we would limit her in terms of—to no contact or interaction with the general public.

(R. at 76, Tr. at 37.)

Gianforte testified that a person with these characteristics would not be capable of performing the full range of unskilled light jobs. (R. at 77, Tr. at 38.) Such a person could perform "some assembly jobs; some inspector, checking, and examining, and weighing type jobs, ... [and] sorting by color or other code [jobs]." (R. at 77, Tr. at 38.) Gianforte further testified that there are 2,500 simple assembly jobs with the sit/stand option and approximately 1,500 weigher, checker, inspector, examiner jobs in the Chicago Standard Metropolitan Statistical Area. (R. at 78, Tr. at 39.) When the ALJ changed the hypothetical to require a sedentary job with only occasional lifting of no more than 10 pounds, Gianforte testified that the amended hypothetical individual could perform the same jobs as the original hypothetical person. (R. at 78–79, Tr. at 39–40.)

## II. The ALJ's Decision

The ALJ determined that, for SSA purposes, Townsend is not disabled. In reaching this conclusion, the ALJ performed the five-step analysis required by SSA regulations. 20 C.F.R. §§ 416.920(a)–(f), 404.1520(a)–(f). The ALJ found that Townsend has "never engaged in substantial gainful activity, and has no past relevant work, and no transferable job skills." (R. at 17, Decision at 5.) In addition, the ALJ found that Townsend is significantly impaired due to her personality disorder, learning disability, and plexiform neurofibroma, but that these impairments were not sufficiently severe to meet or equal a disability under the listings. (*Id.*) At step five, the ALJ determined that Townsend retains the "capacity for light work that would allow for a sit/stand option with no use of the right upper extremity to operate controls or machinery and of use of the right upper extremity for assistance only; with the limitation to simple unskilled work with no interaction with the public; nonexertionally." (*Id.*) Based on the vocational expert's testimony, the ALJ concluded that a person with Townsend's residual functional capacity could work as an assembler, inspector, cashier, or examiner. (*Id.*) Given the great number of these types of jobs, the ALJ concluded that employment opportunities were available in significant numbers.

On appeal, Townsend contends that the ALJ improperly relied on the testimony of a non-treating physician, Dr. Bernet, rather than the medical opinion of her treating physician, Dr. Talamonti. Additionally, Townsend claims that the ALJ improperly applied step five of the disability analysis by failing to present a hypothetical to the vocational expert which accurately described her mental and physical impairments.

## LEGAL STANDARDS

The standard of review for an agency decision is deferential. *Kendrick v. Shalala,* 998 F.2d 455, 458 (7th Cir. 1993). In the absence of an error of law, this Court will uphold the ALJ's findings of fact if supported by substantial evidence. *Griffith v. Callahan,* 138 F.3d 1150, 1152 (7th Cir.1998). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted). The issue before this Court is not whether Townsend is disabled, but whether the ALJ's findings were supported by substantial evidence. *Brewer v. Chater,* 103 F.3d 1384, 1390 (7th Cir.1997). In reviewing the ALJ's decision, we may neither substitute our own judgment for that of the Administration nor reweigh the facts or evidence. *See White v. Apfel,* 167

F.3d 369, 373 (7th Cir.1999); *Brewer*, 103 F.3d at 1390; *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir.1995).

To receive disability benefits, a claimant must be "disabled" as defined by the Social Security Act. An individual is disabled if she cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 416(i). Social Security regulations require the use of a five-step process to determine whether a claimant is disabled. *See, e.g., Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir.1999); *Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993). At issue in this case are first, whether the ALJ improperly weighed the medical evidence; and second, whether the ALJ properly applied step five of the disability analysis. Step five requires the ALJ to determine if, considering age, education, and work experience, the claimant can perform work available in significant numbers in the national economy. 20 C.F.R. § 404.1520.

## ANALYSIS

Townsend presents two principle arguments supporting her claim for relief: 1) the ALJ impermissibly discounted the opinion of her treating physician, Dr. Talamonti; and 2) the ALJ improperly applied step five of the Administration's disability analysis. We address each claim in turn.

### I. Whether the ALJ Improperly Discounted Dr. Talamonti's Opinion that Townsend is Permanently Impaired From Her Surgery

Townsend argues that substantial evidence does not support the ALJ's findings regarding her impairments. Specifically, Townsend contends that the ALJ improperly relied on Dr. Bernet's opinion and discounted Dr. Talamonti's assessment, even though Dr. Bernet never examined Townsend.

■ An ALJ's decision must be based on the testimony and medical evidence in the record. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir.1996). Substantial weight must be given to the medical evidence and opinions submitted, "unless specific, legitimate reasons constituting good cause are shown for rejecting [them]." 20 C.F.R. § 404.1527(c)–(d); *Knight v. Chater*, 55 F.3d 309, 313–314 (7th Cir.1995). Where treating and consulting physicians present conflicting opinions, the ALJ must decide the conflict. *See, e.g., Books v. Chater*, 91 F.3d 972, 979 (7th Cir.1996).

■ This Court, however, need not determine whether the ALJ in this case improperly relied on the opinion of Dr. Bernet, a non-treating physician, rather than the opinion of Dr. Talamonti, a treating physician. Although Townsend vaguely asserts that the two physicians' opinions differ, she never identifies how Dr. Talamonti's opinion is significantly more favorable to her position than Dr. Bernet's. Additionally, our review of the administrative record discloses no significant difference between the views of Drs. Talamonti and Bernet as to Townsend's limitations.

Townsend quotes Dr. Talamonti's opinion that her surgery resulted in a permanent impairment, and appears to believe that his statement translates into an opinion that she is, in fact, disabled. Ignoring for a moment that a doctor is not qualified to render a legal conclusion, an "impairment" is not necessarily a "disability". Under the Act, a person is not disabled unless that person's impairments render her incapable of engaging in gainful employment. Many persons demonstrate that even a significant limitation in the use of one's right arm does not preclude holding a job. Be that as it may, the ALJ accepted Dr. Talamonti's opinion that the operation had a permanent impact on Townsend's functional capacity; he explicitly found that Townsend's ability to use her "upper extremities" was severely curtailed and took that limitation into account when forming his hypothetical and reaching his conclusion. Far from discounting Dr. Talamonti's opinion, the ALJ adopted

it. For these reasons, Townsend's medical-evidence claim is unavailing.[5]

## II. Whether the ALJ Properly Applied Step Five of the Disability Analysis

Townsend claims that the ALJ improperly applied step five of the disability analysis. 20 C.F.R. §§ 416.920(f), 404.1520(f). Specifically, Townsend argues that the hypothetical person posed by the ALJ did not accurately represent her functional limitations. Townsend also contends that the vocational expert, Gianforte, did not consider the combined effect of her physical and mental limitations on her ability to perform certain jobs. Finally, Townsend attacks the reasonableness of the vocational expert's conclusions that she could perform work as an assembler, inspector, examiner, or sorter.

The hypothetical individual presented by an ALJ to a vocational expert "must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record." *Herron v. Shalala,* 19 F.3d 329, 337 (7th Cir.1994). Every detail of a claimant's impairment need not be included in the hypothetical, especially if the record shows that the vocational expert reviewed the medical record. *Cass,* 8 F.3d at 556. Here, the ALJ presented Gianforte with a hypothetical individual with the same limitations as he found applicable to Townsend. Furthermore, the record establishes that Gianforte "reviewed [Townsend's medical] file and considered the vocational factors of age, education, and, in this case, lack of any past relevant work." (R. at 75, Tr. at 36.) Given that Gianforte reviewed Townsend's medical file, it was not necessary for the ALJ to go into extensive detail about the hypothetical person's impairments. Consequently, the hypothetical presented to

the vocational expert accurately described Townsend's limitations as found by the ALJ.

Townsend next argues that the vocational expert failed to consider her physical and mental limitations in tandem. The record, however, clearly indicates that in the hypothetical presented to her, Gianforte simultaneously considered physical and mental impairments similar to Townsend's in making her determination of work ability. Gianforte accounted for Townsend's mental limitations by considering a hypothetical person with "marginal to limited education" who was restricted to "simple work and no interaction with the general public." (R. at 77, Tr. at 38.) At the same time, Gianforte accounted for Townsend's physical limitations by contemplating a hypothetical person who needed the option to sit or stand while working, had substantially diminished strength in the right arm, could not operate machinery, but could occasionally lift 20 pounds and frequently lift 10 pounds, (R. at 76–77, Tr. at 37–38), or, under the amended version, could lift no more than ten pounds occasionally, (R. at 78–79, Tr. at 39–40). Based on an assessment of the combined physical and mental impairments, Gianforte concluded that such an individual could perform existing jobs. (R. at 77, Tr. at 38.) The record shows that Gianforte properly considered the combined effects of Townsend's mental and physical limitations.

Finally, Townsend attacks the reasonableness of the vocational expert's conclusion that she could perform work as an assembler, inspector, examiner, or sorter, given that she is "essentially a one-armed individual." This Court may not evaluate the reasonableness of expert testimony. *See Wilder v. Chater,* 64 F.3d 335, 338 (7th Cir.1995) (explaining that an

---

5. Townsend also appears to argue that her diagnosed personality disorder automatically entitles her to SSI benefits under Listing 12.08. This argument, if made, is frivolous; Listing 12.08(B) requires additional functional limitations before disability will be presumed. Townsend does not argue that her personality disorder results in any of the listed functional limitations, and it is clear from the record that she cannot.

SSI claimant "is entitled to a decision based on the record rather than on a hunch"). Just as an ALJ is not allowed to substitute her lay opinion of depression for the opinion of a mental health expert, *Rohan*, 98 F.3d at 970, it is likewise improper for this Court to determine the reasonableness of whether a person with Townsend's restrictions in the use of her right arm can engage in gainful employment. Rather, this determination is for a vocational expert. In this case, there was no evidence presented on the record challenging Gianforte's vocational expertise in making such a determination. Furthermore, Gianforte based her testimony on her review of Townsend's medical file and the hypothetical posed by the ALJ. Consequently, the ALJ's conclusion that Townsend could perform the jobs identified by Gianforte is supported by substantial evidence.

In sum, the ALJ posed an accurate hypothetical to the vocational expert, the vocational expert properly considered Townsend's physical and mental impairments when making her recommendation, and we decline Townsend's invitation to re-evaluate the vocational expert's testimony that identifiable jobs exist that are within Townsend's capabilities. Therefore, the ALJ's determination at step five was supported by substantial evidence in the record.

## CONCLUSION

This Court's review is not de novo. We do not decide what determination this Court would have made as an ALJ assigned to this case. Although the Court is very sympathetic to Ms. Townsend's unfortunate physical and mental impairments, the Court cannot conclude, given the deferential standard of review and the record developed during the agency proceedings, that the ALJ's decision was erroneous. Given Ms. Townsend's age, she may wish to develop more substantial expert evidence, especially psychiatric evidence that evaluates whether she currently has some diagnosable stress disorder, and reapply for benefits at any appropriate time.

For the reasons contained in this opinion, we deny Townsend's motions for summary judgment, (19–1; 21–1), and remand, (19–2). The Clerk of the Court is instructed, pursuant to Federal Rule of Civil Procedure 58, to enter judgment in favor of the defendant.