**Howard CONNOUR, Plaintiff,**

v.

**Larry G. MASSANARI, Acting Commissioner of Social Security, Defendant.**

**No. 01 C 701.**

United States District Court, N.D. Illinois, Eastern Division.

Nov. 9, 2001.

Barry Alan Schultz, Schultz & Winick, PC, Evanston, IL, for Howard Connour, Plaintiff.

James Peter Fieweger, United States Attorney's Office, Chicago, IL, for Kenneth S. Apfel, Defendant.

### MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiff Howard Connour seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416, 423. Connour claims that the Administrative Law Judge's ("ALJ") decision to deny him benefits should be reversed and set aside because it was not supported by substantial evidence. Because we find that the ALJ reasonably concluded that Connour could perform a significant number of jobs in the national economy and was, therefore, not disabled within the meaning of the Social Security Act, we affirm the ALJ's decision and deny Connour's motion for summary judgment. (R. 9–1.)

### RELEVANT FACTS

Connour was fifty-two years old at the time of the ALJ's decision and had a General Equivalency Degree (GED). Connour last worked in October 1997 as a construction laborer, and prior to that he worked as a roofer.

### I. Connour's Hearing Testimony

On March 15, 2000, Connour testified at a Social Security Administration Hearing ("SSA Hearing") in Urbana, Illinois before ALJ Barbara J. Welsch. At the hearing, Connour testified that he was unable to work because of neck pain and back pain in three different areas: (1) his middle back where he had a fractured vertebrae; (2) his lower back; and (3) the right sciatic nerve that goes down into his leg. Connour testified that although he underwent an angioplasty in 1997 to clear the arteries in his legs, he has never had surgery on his back. Connour further testified that he has undergone therapy for his back, with the most recent session in 1999. He stated that the medications for his back and neck pain include Vicodin, which makes him drowsy, and Darvon, which he

takes when he is going to be driving. Connour said that he drives a couple of days a week out of necessity. Connour further testified that he still has breathing problems and gets winded with any kind of physical exertion, but that he is not taking any medication for these problems because no doctor has ever prescribed anything. He said that he smokes two packs of cigarettes a day and that his doctor has told him to stop smoking.

Connour stated that on a typical day he wakes up at 7:00 a.m., has coffee, takes a shower, eats breakfast and talks with his wife before she goes to work. During the day, he watches television or reads. Occasionally, he visits with family or friends. His grandchildren visit with him approximately twice a week, but Connour stated that he does not babysit them. When his wife is at work, he fixes a sandwich or a can of soup for lunch, but he does no other housework. Connour said that he traveled to the local supermarket the week before the SSA Hearing to buy a book and a loaf of bread. He testified that he does not engage in outdoor activities. He owns a computer, but he rarely uses it because it bothers his back. Most recently, Connour used it to send an email to his sister approximately one month before the SSA Hearing.

The ALJ asked Connour why he left his roofing job, and he replied that he wanted to work outside of the Laborer's Union and to earn more money. Connour further testified that when he worked as a roofer, he was never a supervisor. When the ALJ inquired as to whether Connour had applied for any jobs since he stopped working as a construction laborer in 1997, he indicated that he had applied for approximately 200 different types of positions including factory, maintenance and fast food positions, but that he had not been offered any of the jobs. He stated that he informs potential employers of his back, cardiac and pulmonary problems.

When asked by his attorney to name the medications he is taking other than Vicodin and Darvon, Connour replied that Dr. Lee–Sigler also has him taking Paxil, and that his regular doctor, Dr. Bitts, prescribed Trental, Norvast and Lipitor, all of which he takes daily with an aspirin. Regarding his most recent work experience as a construction laborer, Connour stated that he typically worked ten to twelve hours a day, all except thirty minutes of which he spent on his feet. He stated that he frequently had to lift ten to ninety pounds, depending on the job he was doing. Finally, when questioned by his attorney as to why he no longer fishes or engages in house or yard work, Connour indicated that he has not done any of those things since 1997 because they cause him too much back pain.

## II. Vocational Expert Nancy Wright's Testimony

The ALJ asked Vocational Expert Nancy Wright a series of questions regarding Connour's vocational profile and residual functional capacity ("RFC"). First, the ALJ posed a hypothetical question to Wright involving an individual of Connour's age, education and work experience. This individual was limited to exceptions including no jobs that required climbing or unprotected heights, repetitive bending or stooping, crawling, crouching, kneeling or over the shoulder work. The ALJ then asked Wright to explain how these restrictions would affect the individual's performance of his past relevant work. Wright replied that his ability to perform such work would be eliminated. (R. 4, Admin. R. at 50, SSA Hr'g Tr.)

When asked by the ALJ whether the individual in the hypothetical had any skills that could transfer to other jobs,

Wright replied that there were such jobs. (*Id.* at 50–51.) In the area of semi-skilled positions in the state of Illinois, Wright listed ride operator (3,565 jobs), production clerk (11,545 ) and car inspector (5,440). In the area of unskilled, light-level positions, Wright listed counter attendant (62,890), airline service representative (38,457), messenger (7,298), deli counter (10,485), cashier (126,860) and packer (18,704). Wright testified that none of the listed positions would require foot or leg controls or working in extreme cold or heat.

On cross-examination, Connour's attorney asked Wright whether Connour's previous positions as a construction laborer and roofer were considered semi-skilled or unskilled. Wright stated that she classified Connour's position as a construction laborer as unskilled and his roofer position as skilled. (*Id.* at 52–53.)

## III. Medical Evidence

Connour was seen by various physicians and health care professionals at the Carle Clinic in Urbana, Illinois beginning in October 1997, when he alleged the onset of pain in his neck, middle back and lower back radiating into his right leg. On October 27, 1997, Dr. Noonan, an orthopedic physician, reported that Connour indicated that he had a two-month history of dorsal back pain due to a fall at work. The neurological exam of Connour's upper and lower extremities was normal, he had good neck movement and his straight leg raising was negative. Dr. Noonan diagnosed subacute dorsal back sprain and indicated that while he did not think surgery was necessary, he recommended a rehabilitation program before returning to work to prevent chronic pain syndrome. Dr. Noonan referred Connour to Dr. Lee–Sigler, a specialist in physical medicine and rehabilitation.

Dr. Lee–Sigler examined Connour in November 1997. Connour told Dr. Lee–Sigler that his back pain was relieved to some extent by sitting or lying flat, but was exacerbated by extension, being on his feet or walking. Upon physical examination, Dr. Lee–Sigler indicated that there was notable thoracic kyphosis but no atrophy or swelling, and he had four-plus to five out of five muscle strength in his lower limbs. Dr. Lee–Sigler diagnosed post-thoracic contusion/sprain and sacroiliac sprain, and she recommended physical therapy and medication. She noted that Connour should remain off of work for two and a half months and would need progressive conditioning prior to returning to work.

In December 1997, Connour saw Dr. Lee–Sigler and indicated that he had severe pain in the thoracic area and that his level of pain had not improved despite physical therapy. Her diagnosis was the same as in November 1997. She recommended continued physical therapy and sacroiliac joint injections. Dr. Lee–Sigler stated that Connour should remain off work for eight weeks and would need progressive conditioning prior to returning to work. Dr. Lee–Sigler referred Connour to Dr. Johnson for electrodiagnostic testing, which was performed in February 1998. The test results were essentially normal, revealing normal motor nerve studies and no needle electromyogram (EMG) abnormalities in the selected muscles tested. Magnetic resonance imaging (MRI) of the cervical spine revealed degenerative disc problems with mild disc bulging.

Dr. Lee–Sigler examined Connour in February 1998, at which time he complained of significant pain in the thoracic spine area radiating into his shoulders. Physical examination revealed that cervical, bilateral upper limb, lumbosacral and

bilateral lower limb ranges of motion were all within functional limits. Muscle strength was five out of five in the right and left lower limbs and right upper limb and four out of five in the left upper limb. Straight leg raising caused lower back pain on the right at seventy-five degrees. Her diagnosis was post-thoracic contusion, overlying myofascial pain with history of thoracic compression fracture, lumbar disc disease with flare and cervical disc disease. She thought, however, that the diagnosis was not significant enough to cause Connour's current symptoms. (*Id.* at 204, Feb. 11, 1998 Lee–Sigler Exam. Rpt.) Dr. Lee–Sigler advised continued physical therapy and recommended Dopplar studies to rule out thoracic outlet syndrome. Her March 1998 exam notes state that the Dopplar studies were essentially unremarkable. (*Id.* at 194, Mar. 3, 1998 Lee–Sigler Exam. Rpt.)

At the March 1998 exam, Dr. Lee–Sigler recommended additional back injections and a continuation and upgrade of Connour's physical therapy to advance him to progressive conditioning so that he could return to work. Dr. Lee–Sigler further recommended that Connour remain off of work for six more weeks. Connour's next examination by Dr. Lee–Sigler was in early April 1998, during which he reported having spasms in the left lumbar spine, pinching pain in his left neck, burning pain in the thoracic spine and tingling in his left leg. Physical examination revealed that cervical and lumbosacral ranges of motion were moderately restricted and that muscle strength was four out of five in the bilateral upper and lower limbs. Because his back pain had not responded to conservative therapy, Dr. Lee–Sigler referred Connour to a rheumatologist and discontinued therapy pending those results.

On April 24, 1998, Dr. Munoz, a rheumatologist, examined Connour. Dr. Munoz reported that there was no significant muscular weakness in any of the extremities, that deep tendon reflexes were symmetrical and that motion of hips, lumbar spine and cervical spine elicited pain. Dr. Munoz diagnosed significant degenerative disease in the cervical and lumbar spine. He also noted that Connour suffered from significant coronary heart disease and peripheral vascular disease. Dr. Lee–Sigler examined Connour in late April 1998 and reported moderately restricted range of motion of the cervical and lumbosacral muscles. Muscle strength was four-plus to five out of five in the bilateral upper and lower limbs. She noted some decreased sensation in the C8 dermatone, and that straight leg raising caused back pain at seventy-five degrees. Dr. Lee–Sigler opined that Connour was nearing maximum medical improvement and indicated that a functional capacity evaluation should be done so that more specific decisions could be made with regard to his work tolerances.

On June 16, 1998, Connour underwent a functional capacity evaluation conducted by two physical therapists at the Carle clinic. The exam lasted three hours. The therapists noted that Connour demonstrated a very decreased condition status with limited cervical and lumbar range of motion, and that he was unable to complete the required repetitions of certain activities due to subjective pain complaints. Regarding the legitimacy of Connour's efforts, the therapists noted that some discrepancies were observed, but that the evaluative findings appeared to be his current functional tolerances. The therapists concluded that based upon Connour's overall performance, he was performing at the "above-light" physical demand level, *i.e.* lifting ten pounds frequently and thirty pounds occasionally. Additionally, Connour demonstrated decreased tolerances to work postures including bending, reaching,

climbing, squatting, balancing, crawling, kneeling, walking and standing. The therapists recommended that Connour attend a back school to learn proper body mechanic techniques, restrict himself to lifting ten pounds frequently and thirty pounds occasionally, attend a daily group program for two weeks to establish a home exercise program to decrease pain, and then progress to a work-conditioning program to increase tolerance to work activities.

Dr. Lee–Sigler examined Connour ten days after the functional capacity evaluation. She indicated that he reported no change in symptoms, and concluded that he was testing at an "above-light" physical demand level. Dr. Lee–Sigler noted that she concurred with the recommendations of the functional capacity evaluation. Dr. Lee–Sigler next examined Connour in July 1998. The physical examination revealed a normal gait, muscle strength of four-plus to five out of five in the bilateral upper and lower limbs and decreased sensation in the fourth and fifth digits. She reported that Connour was functionally at maximum medical improvement. She opined that his permanent restrictions were lifting, pulling and pushing ten pounds frequently and thirty pounds occasionally, with a sit/stand option every twenty to thirty minutes. Dr. Lee–Sigler saw Connour in September 1998 for a medication adjustment and, in her examination notes, reiterated that she believed he was at maximum medical improvement. (*Id.* at 170, Sept. 23, 1998 Lee–Sigler Exam. Rpt.)

Connour underwent a consultative examination[1] by Dr. Patel on October 15, 1998. Dr. Patel reported that Connour's gait was normal, that he had some reduction in back, arm and leg range of motion and that he had normal reflexes and sensation. Dr. Patel diagnosed chronic back pain with a history of compression fractures of Connour's thoracic spine. Dr. Lee–Sigler again saw Connour in November 1998 for a medication adjustment. She reiterated that she believed Connour had reached maximum medical improvement and diagnosed the same permanent restrictions as in July 1998. (*Id.* at 169–70, Nov. 10, 1998 Lee–Sigler Exam. Rpt.)

Dr. Graham, a State SSA medical consultant, reviewed all of the reports in Connour's file and completed RFC evaluations in December 1998 and March 1999. Dr. Graham concluded that Connour could lift ten pounds frequently and twenty pounds occasionally, stand, walk or sit a total of six hours in an eight hour work day (with normal breaks) and perform unlimited pushing or pulling. Additionally, Dr. Graham noted that Connour must avoid concentrated exposure to heights and perform only occasional stooping, kneeling and crouching. Dr. Graham, however, indicated that the record did not include a treating source statement regarding Connour's physical capacities.

Dr. Lee–Sigler next examined Connour in May 1999. He complained of increased neck pain and pinching back pain and indicated that he was unable to find any truly comfortable neck position. X-rays revealed no changes from previous x-rays. The physical examination revealed slightly decreased range of motion of the cervical and lumbar spines. Muscle strength was four out of five in the bilateral upper and lower limbs and straight leg raising caused pain at thirty degrees. Dr. Lee–Sigler reduced Connour's functional status to a sedentary physical demand level, restricting lifting to no more than ten

---

1. "A consultative examination is a physical or mental examination purchased at [the SSA's] request and expense from a treating source or another medical source, including a pediatrician when appropriate." 20 C.F.R. § 404.1519.

pounds occasionally, with no bending or twisting past thirty degrees and a sit/stand option every twenty to thirty minutes. She requested that a MRI and EMG be performed. In July 1999, Dr. Lee–Sigler reported that the EMG was essentially normal and that the cervical MRI was unchanged from the previous one conducted in February 1998. Dr. Lee–Sigler again examined Connour in September 1999 and diagnosed that he could lift, pull or push ten pounds on occasion, thirty pounds frequently, no bending or twisting past thirty degrees, with a sit/stand option every twenty to thirty minutes.

Connour saw Dr. Lee–Sigler next on January 19, 2000. He complained of worsening neck pain radiating to the shoulder region. She reported that muscle strength was relatively unchanged and that low-back range of motion was moderately restricted. She opined that Connour was totally disabled and unable to work outside the home, and again referred him to Dr. Johnson. (*Id.* at 304, Jan. 19, 2000 Lee–Sigler Exam. Rpt.) Dr. Johnson examined Connour on January 26, 2000. She reported moderate tenderness in the cervical paraspinal muscles, and that a very light touch caused a severe pain reaction. She diagnosed myofascial pain with significant muscle spasticity and indicated that she did not think prolotherapy was appropriate.

## IV. The ALJ's Decision

On May 22, 2000, ALJ Barbara Welsch determined that, for the purpose of disability insurance benefits, Connour was not disabled. In reaching this conclusion, the ALJ performed the five-step analysis required by SSA regulations. 20 C.F.R. §§ 416.920, 404.1520. The ALJ found that Connour had not worked or otherwise engaged in any substantial, gainful activity at any time since the onset of his alleged disability on October 23, 1997. (R. 4, Admin. R. at 16, ALJ Decision.) Second, the ALJ stated that Connour's alleged inability to work due to breathing and heart problems was "not supported by the record." (*Id.* at 17.) The AJL determined, however, that Connour had documented degenerate lumbar cervical spondylosis with a history of thoracic compression fractures, and that his combination of impairments was severe. (*Id.*)

The ALJ concluded that "the degree of [Connour's] alleged pain and functional limitation was not credible and it was not supported by medical evidence or relevant credibility factors." (*Id.* at 22.) The ALJ determined that Connour had the RFC to perform exertional and non-exertional requirements of light work with some exceptions. (*Id.*) Based on the evidence, the ALJ determined that Connour was "limited ... to lifting no more than twenty pounds at a time with frequent lifting and carrying of objects weighing up to ten pounds ... should not perform repetitive bending or stooping ... should not perform work that requires crawling, crouching, kneeling or over shoulder work ... [and] should not climb at unprotected heights." (*Id.* at 20.) Based on the evidence and the vocational expert's testimony, the ALJ concluded that Connour was unable to perform his past relevant work as a construction laborer or roofer. (*Id.* at 21.)

On the other hand, based on the vocational expert's testimony and keeping in mind the non-exertional limitations stated above, the ALJ found that there were a significant number of jobs in the national economy which Connour could perform. (*Id.* at 23.) The ALJ concluded that Connour had skills transferable to the semi-skilled, light-level jobs of ride operator (3,655 jobs), production clerk (11,545) and

car inspector (5,440 jobs). (*Id.* at 21.) Additionally, the ALJ stated that even if Connour had no transferable skills, he would still have to be found not disabled. (*Id.*) Based on the vocational expert's testimony, the ALJ found that Connour could perform the unskilled, light-level jobs of counter attendant (62,890), airline service representative (38,457), messenger (7,298), cutter (10,845), cashier (126,860), packer (18,704) or housekeeper (41,120). (*Id.*) Therefore, the ALJ concluded that Connour was not disabled, as defined by the Social Security Act, at any time through the date of her decision. (*Id.*)

Currently before this Court is Connour's motion for summary judgment. On appeal, Connour contends that: (1) the ALJ improperly weighed the medical evidence; (2) the ALJ's credibility determination was patently wrong and based upon factual errors; (3) the ALJ failed to consider significant evidence favorable to Connour; and (4) the testimony of the vocational expert did not meet the Commissioner's step five burden of proving jobs which Connour could perform. For the following reasons, we deny Connour's motion and affirm the ALJ's decision.

## LEGAL STANDARDS

The standard of review for final decisions of the Commissioner (here the ALJ) in federal benefits cases is deferential. *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir.1993). The Social Security Act establishes that the findings as to any fact are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation and quotation omitted). In other words, the ALJ's findings must be sup-

ported by more than a mere scintilla of the evidence, but they may be supported by less than the greater weight of the evidence. *See id.* In reviewing the ALJ's decision, we may neither substitute our own judgment for that of the ALJ nor reweigh the facts or evidence. *White ex. rel. Smith v. Apfel*, 167 F.3d 369, 373 (7th Cir.1999). To receive disability benefits, a claimant must be "disabled" as defined by the Social Security Act. An individual is disabled if he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 416(i). SSA Regulations require the use of a five-step process to determine whether a claimant is disabled. *See, e.g., Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir.1999).

## ANALYSIS

At issue in this case is: (1) whether the ALJ improperly weighed the medical evidence; (2) whether the ALJ's credibility determination was patently wrong and based upon factual errors; (3) whether the ALJ failed to consider significant evidence favorable to Connour; and (4) whether the testimony of the vocational expert met the Commissioner's step five burden of proving jobs which Connour could perform.

### I. Whether the ALJ Improperly Weighed the Medical Evidence

Connour argues that the ALJ failed to give controlling weight to the medical opinion of Dr. Lee–Sigler, one of his treating physicians. Specifically, Connour contends that the ALJ should have given controlling weight to the doctor's opinion concerning Connour's need for a sit/stand option every twenty to thirty minutes while on the job. Connour also contends that controlling weight should have been given to Dr. Lee–Sigler's May 1999 opinion that changed his limitations to a sed-

entary level of work. Further, Connour asserts that the ALJ erred in finding that Dr. Lee–Sigler's opinion was inconsistent with the functional capacity evaluation. Finally, Connour contends that even if Dr. Lee–Sigler's opinions were not entitled to controlling weight, the ALJ failed to give her opinions great weight, as required by 20 C.F.R. § 404.1527(d).

An ALJ's decision must be based on the testimony and medical evidence in the record. *Rohan v. Chater,* 98 F.3d 966, 970 (7th Cir.1996). The ALJ must examine and weigh all evidence, including observations by treating and examining physicians, third-party testimony, the claimant's testimony, daily activities, functional restrictions, pain medication taken and aggravating or precipitating factors, to evaluate how much the claimant's impairment affects his or her ability to work. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir.1994). A treating physician's opinion will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Shramek v. Apfel,* 226 F.3d 809, 814 (7th Cir.2000). An ALJ may reject a treating physician's opinion if it is internally inconsistent or inconsistent with other evidence. *Knight v. Chater,* 55 F.3d 309, 313–14 (7th Cir.1995) (citing 20 C.F.R. § 404.1527). Where treating and consulting physicians present conflicting opinions, the ALJ must decide the conflict. *See, e.g., Books v. Chater,* 91 F.3d 972, 979 (7th Cir.1996).

The ALJ cannot ignore an entire line of evidence. *Zblewski v. Schweiker,* 732 F.2d 75, 78–79 (7th Cir.1984). If she did, she would fall below the minimum level of articulation required. *Id.* The ALJ's decision "must be based on consideration of *all* the relevant evidence and the reasons for his conclusion must be stated in a manner sufficient to permit an informed review." *Ray v. Bowen,* 843 F.2d 998, 1002 (7th Cir.1988) (emphasis in original). Although the ALJ is not required to comment specifically on every piece of evidence presented, the SSA Regulations require the ALJ to review all medical findings and other evidence that support a medical source's statement regarding disability. *Id.* A statement of "disability" by a medical source, however, does not mean that the ALJ is required to find that a plaintiff is disabled. 20 C.F.R. § 416.927(e)(1). Final responsibility for a decision regarding disability rests with the Commissioner. *Id.* at § 416.927(e)(2).

In this case, the ALJ properly rejected the portion of Dr. Lee–Sigler's opinion that Connour needed a sit/stand option every twenty to thirty minutes while on the job. The ALJ's decision demonstrates that she found Dr. Lee–Sigler's opinion inconsistent with other evidence in the record. While the ALJ did not specifically address Dr. Lee–Sigler's recommendation for a sit/stand option, her decision enables this Court to adequately track her reasoning, and we are assured that she considered all of the important evidence in arriving at her decision to reject the sit/stand limitation. Taken together, the evidence discussed by the ALJ in her decision provides ample support for her determination that Connour's condition did not warrant a sit/stand option every twenty to thirty minutes.

The ALJ expressly noted Dr. Lee–Sigler's inclusion of a sit/stand option in the doctor's July 1998 examination report. (R. 4, Admin. R. at 19, ALJ Decision.) After discussing other medical evidence, however, including other physicians' and therapists' diagnoses, the ALJ concluded that a sit/stand limitation was not in line with such evidence and, thus, not warranted. (*Id.*) In fact, the ALJ discussed chronologi-

cally most of Connour's examinations by both treating and non-treating physicians. For example, the ALJ noted that Dr. Lee–Sigler's July 1998 examination indicated that Connour had a normal gait, and that the strength of his upper and lower bilateral extremities was four-plus to five out of five. (*Id.*) The ALJ further noted that Connour underwent a consultative examination in October 1998 that revealed normal neurology and neck range of motion. (*Id.* at 19.) Additionally, the ALJ stated that Connour underwent repeat EMG testing in July 1999 which was within normal limits, and had a new MRI taken which revealed that there had been no change since the last MRI. (*Id.* at 20.) Finally, Dr. Lee–Sigler's sit/stand recommendation was inconsistent with the June 1998 functional capacity evaluation and with the December 1998 and March 1999 RFC evaluations. (*Id.* 18–19.)

■ The ALJ also did not err in refusing to give controlling weight to Dr. Lee–Sigler's May 1999 opinion in which she changed Connour's limitation from a light to a sedentary level of work.[2] The ALJ expressly stated that she did not assign controlling weight to Dr. Lee–Sigler's opinion that Connour required a ten pound lifting restriction because the ALJ concluded that the restriction was given in response to Connour's subjective complaints of pain, rather than based on objective findings, and because it contradicted the findings of the June 1998 formal functional capacity evaluation. (*Id.* at 19.) The ALJ further noted that Dr. Lee–Sigler released Connour from her care in November 1998 and that Connour returned in May 1999 complaining of worsening symptoms, but that x-rays and muscle strength tests showed no new change. (*Id.* at 19–20.) As the ALJ stated, the revised lifting requirement was inconsistent with the formal functional capacity evaluation and various other evidence cited by the ALJ throughout her chronology of Connour's examinations. For example, as noted above, the ALJ observed that Dr. Lee–Sigler's July 1998 examination revealed that Connour had a normal gait, and her May 1999 examination revealed that Connour's muscle strength was four out of five in his upper and lower extremities. (*Id.* at 19.) Therefore, the ALJ decided not to assign controlling weight to Dr. Lee–Sigler's revised lifting limitation because it was inconsistent with the other objective medical evidence in the record and because it was based primarily on Connour's subjective complaints of pain. *See Diaz v. Chater,* 55 F.3d 300, 308 (7th Cir.1995) (stating that an ALJ could consider a portion of a doctor's diagnosis which appears to be based on a claimant's own statements as less significant than the doctor's other findings) (citation omitted).

■ The ALJ provided an adequate explanation as to why she adopted the opinion of the State Agency doctor in the RFC evaluation over that of Dr. Lee–Sigler and, in so doing, the ALJ demonstrated that her decision in this regard was supported by substantial evidence. Connour erroneously stated that "the only medical opinion relied upon by the ALJ is that of the State Agency doctor who neither examined nor treated him." (R. 9–2, Pl.'s Mem. in Supp. of Mot. for Summ. J. at 14.) To the contrary, the ALJ considered, evaluated

**2.** Connour also argues that the ALJ erred in finding that Dr. Lee–Sigler's opinion was inconsistent with the June 1998 formal functional capacity evaluation. (R. 9–2, Pl.'s Mem. in Supp. of Mot. for Summ. J. at 13.) We disagree. The inconsistency referenced by the ALJ was due to the disparity in recommendations between Dr. Lee–Sigler and the therapists who conducted the functional capacity evaluation, rather than an inconsistency in any of the technical medical evidence leading to those recommendations.

and described various doctors' reports and notes, including Dr. Lee–Sigler's, the therapists who conducted the June 1998 formal functional capacity evaluation and the State Agency doctor who completed the RFC evaluation. (R. 4, Admin R. at 18–20, ALJ Decision.) The ALJ's decision clearly evinces that she considered Dr. Lee–Sigler's opinions. Merely because the ALJ did not adopt all of Dr. Lee–Sigler's recommendations does not lead this Court to conclude that the ALJ failed to consider the doctor's opinions properly. *See Books v. Chater,* 91 F.3d 972, 979 (7th Cir.1996) (finding that nothing mandates that a treating physician's opinion must be accepted over a consulting physician's opinion, provided that the merits of both opinions are duly considered).

The ALJ additionally considered Connour's testimony regarding his daily activities as evidence that indicated a capacity for work and, thus, was inconsistent with Dr. Lee–Sigler's determination that Connour's condition mandated a sedentary work level. The ALJ engaged in a chronological consideration of Connour's medical examinations, considered his testimony regarding his daily activities and then determined Connour's RFC, based on all of the evidence in the record. (R. 4, Admin. R. at 18–20, ALJ Decision.) Although the ALJ's determination coincided with that of the State Agency doctor, the ALJ noted that this RFC was more restrictive than the formal functional capacity evaluation initially adopted by Dr. Lee–Sigler, thus further indicating that the ALJ gave proper weight to Dr. Lee–Sigler's and other examining source's opinions. (*Id.* at 20.) Therefore, we conclude that the weight assigned to the medical evidence by the ALJ was supported by substantial evidence.

## II. Whether the ALJ's Credibility Determination was Patently Wrong and Based Upon Factual Errors

Next, Connour argues that the ALJ's credibility determination was patently wrong and based upon factual errors. Specifically, Connour contends that the ALJ noted that Doppler studies were performed, but that the ALJ erroneously found that the studies were "negative," thereby tainting her entire decision. (R. 9–2, Pl.'s Mem. in Supp. of Mot. for Summ J. at 16.) Moreover, Connour claims that the ALJ failed to mention the arterial blood flow test that revealed moderately reduced blood flow to the left leg. (*Id.*) He also asserts that the ALJ improperly made her own independent medical determination and then erroneously based her credibility findings upon that determination. (*Id.* at 17.) Finally, Connour maintains that the ALJ improperly relied upon Connour's testimony regarding his limited daily activities to support a negative credibility finding.[3] (*Id.* at 18.)

The ALJ's determination regarding a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements

---

3. Connour also claims that the ALJ failed to take his work history into account when assessing his credibility pursuant to Social Security Ruling 96–7p. We disagree. The ALJ questioned Connour extensively at the SSA Hearing regarding his work as a construction laborer and roofer. (R. 4, Admin. R. at 36–37, SSA Hr'g Tr.) Additionally, in her findings, the ALJ stated that Connour was "not able to perform his past relevant work as a construction laborer and roofer." (*Id.* at 22, ALJ Decision.) Thus, although the ALJ ultimately deemed Connour less than credible regarding his claim of total disability, the ALJ sufficiently considered Connour's work history.

and the reasons for that weight." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (quoting Social Security Ruling 96–7p). It is not sufficient for the ALJ to make a single conclusory statement that the claimant's allegations of pain have been considered and/or found not credible. *Id.* Instead, the ALJ must "build a bridge from the evidence to [her] conclusion." *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir.2000). The weight to be given to a particular piece of evidence, however, is within the ALJ's discretion. *Diaz*, 55 F.3d at 309. The ALJ is not required to discuss every piece of evidence in the record. *Id.* Finally, as Connour correctly indicated, the Seventh Circuit has held that, because the ALJ is in the best position to determine credibility, the ALJ's credibility findings will not be disturbed unless they are "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir.2000).

In this case, the ALJ's decision set forth specific reasons as to why she found that Connour was less than credible with regard to his allegations of total disability and, as such, her credibility determination is neither patently wrong nor based upon factual errors. Connour contends that the ALJ erroneously found in her opinion that Connour's Doppler studies were negative, and he asserts that "this factual error taints her entire decision." (R. 9–2, Pl.'s Mem. in Supp. of Mot for Summ. J. at 16.) He cites a December 17, 1998 vascular lab report which indicated "normal resting arterial flow study bilaterally; [e]xercise results in moderate arterial flow reduction with claudication-like symptoms." (R. 4, Admin. R. at 165, Dec. 17, 1998 Lab Rpt.) Connour, however, failed to notice that the ALJ was referencing a different report when she stated that the Doppler studies were negative, as indicated by her citation, "Exhibit 7F/32." (*Id.* at 18, ALJ Decision.) The ALJ was citing the March 3, 1998

examination notes of Dr. Lee–Sigler in which she wrote, "Doppler studies were performed regarding the neck pain with numbness into the 5th, 1st, and 2nd digits. Their studies were essentially unremarkable." (*Id.* at 194, Mar. 3, 1998 Lee–Siegler Exam. Rpt.)

Furthermore, Connour argues that the ALJ failed to mention the lower extremity arterial duplex study, contained in the same vascular lab report referenced above, which established "mild common femoral artery sentosis of 50–65%." (*Id.* at 165, December 17, 1998 Lab Rpt.) The next sentence of that report reads, "[t]here has been no change from the study of 1/97." (*Id.*) As noted above, the ALJ is not required to analyze every piece of evidence in the record, and it is up to her to determine the amount of weight given to each piece of evidence. *Diaz*, 55 F.3d at 309. Because there had been no change in Connour's condition since his bilateral iliac angioplasty in 1997, the ALJ likely determined that there were more crucial examination reports to discuss. Indeed, the ALJ provided specific reasoning—substantiated by evidence drawn from the record—to support her credibility finding, such that this Court finds that she built an adequate bridge from the evidence to her conclusion. For example, the ALJ indicated that Connour had attended physical therapy, testified that his pain medications were effective, had not sought emergency room treatment, had never been hospitalized for his back problems despite the severe degree of pain he reported and had never had surgery recommended. (R. 4, Admin. R. at 20, ALJ Decision.) Moreover, Dr. Lee–Sigler indicated that Connour's pain should be controlled with nonsteroidal anti-inflammatory medication, and that she agreed with the findings of the

functional capacity evaluation.[4] (*Id.*)

■ Finally, Connour objects to the ALJ's use of his daily activities to support her negative credibility finding, and he contends that his activities are not inconsistent with his claimed limitations, *i.e.* total disability requiring a sedentary work level. We disagree. First, the ALJ considered several factors, such as medication and its effectiveness and other treatments Connour had undergone, when assessing his credibility. Second, it is reasonable to conclude that an individual who engages in the daily activities of driving, reading, light grocery shopping and visiting with his grandchildren has the capacity to engage in light-level work with the exertional and non-exertional limitations outlined by the ALJ, especially when such a conclusion is substantiated by the objective medical evidence in the record. Connour was correct to note that "courts will generally not upset credibility determinations on appeal if they find some support in the record and are not patently wrong." (*Id.* at 16, citing *Herron*, 19 F.3d at 335.) As such, we conclude that the ALJ's credibility findings are supported by substantial evidence and are not patently wrong.

## III. Whether the ALJ Failed to Consider Significant Evidence Favorable to Connour

Next, Connour claims that the ALJ failed to consider significant evidence favorable to him. Specifically, Connour argues that the ALJ failed to acknowledge numerous test results and diagnoses contained in various examination reports, and he alleges that this is tantamount to ignoring significant evidence.

■ The ALJ should consider and discuss all credible medical evidence that is supported by clinical findings and relevant to the question at hand. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir.1997) (citations omitted). An ALJ may not discuss only the evidence that favors his conclusion, but rather he must articulate, at some minimum level, his analysis of the evidence to allow a reviewer to trace his path of reasoning. *Diaz*, 55 F.3d at 309. At the same time, the weight to be given to a particular piece of evidence is within the ALJ's discretion, and the ALJ is not required to discuss every piece of evidence in the record. *Id.*

■ The conclusion ultimately arrived at by the ALJ—that Connour could not perform his past relevant work as a construction laborer or roofer but that he had the RFC to perform light work with certain exertional and non-exertional limitation—reveals that the ALJ did not fail to consider evidence favorable to Connour. First, although not required to comment on every piece of medical evidence, the ALJ discussed a great deal of medical evidence in her opinion. (R. 4, Admin R. at 16–20, ALJ Decision.) For example, the ALJ noted that Connour had a "history of bilateral iliac angioplasty and three vessel bypass grafting" and "documented degenerative lumbar cervical spondylosis with a history of thoracic compression fractures which limit his ability to perform basic work activities." (*Id.* at 16–17.) The

---

4. The ALJ also noted that Connour did not have the usual signs of severe pain, such as abnormal weight loss or muscle atrophy. Regarding this statement, Connour argues that the ALJ "improperly made her own independent medical determination, and then improperly based her credibility findings on that determination." (R. 9–2, Pl.'s Mem. in Supp. of Mot. for Summ. J. at 18.) Even assuming that the ALJ made an independent medical determination, removal of the ALJ's determination does not affect the Court's ability to track the ALJ's reasoning and to conclude that the ALJ built an adequate bridge from the evidence to her conclusion.

ALJ also discussed Connour's subjective complaints of pain, such as Connour's assertions that he could only stand for an hour or two or drive for half an hour before the pain starts. (*Id.* at 20.) Also, simply because the ALJ did not expressly comment on a particular piece of evidence, such as the January 1999 arteriogram and individual test results of the functional capacity evaluation, does not mean that the ALJ did not consider that evidence.

Second, the ALJ is not a physician. As such, it was reasonable for her to look primarily to the diagnoses and recommendations of the various physicians and therapists who had either examined Connour or his medical file when she made her ultimate conclusion regarding Connour's RCF. (*Id.*) Connour himself cites these physicians and therapists who performed the tests and wrote up his examination results. (R. 9–2, Pl.'s Mem. in Supp. of Mot. for Summ. J. at 19–20.) These physicians and therapists, and not the ALJ, were in the appropriate position to determine the correct amount of weight to be given to each of the individual test results, and they acted accordingly when rendering their diagnoses and recommendations. Had the ALJ not duly credited their determinations after they examined Connour and/or his medical records, Connour likely would have contended that the ALJ made her own, independent medical determination and improperly substituted her opinion for that of the physicians and therapists. Thus, we conclude that the ALJ did not fail to consider significant evidence, and that her RFC and credibility determinations were supported by substantial evidence.

## IV. Whether the Vocational Expert's Testimony Met the Step Five Burden of Proving Jobs Which Connour Could Perform

Finally, Connour contends that the testimony of the vocational expert did not meet the Commissioner's step five burden of proving that there are jobs available in significant numbers in the national economy that Connour could perform. Specifically, Connour alleges that the vocational expert failed to provide sufficient evidence concerning the skills acquired by Connour and which of these skills were transferable to the jobs that the vocational expert indicated Connour could perform.

█ We reject this argument for two reasons. First, step five requires the ALJ to determine if, considering age, education and work experience, Connour could perform work available in significant numbers in the national economy. 20 C.F.R. § 404.1520. Even assuming that the vocational expert did not testify concerning Connour's skills and did not adequately mention which of these skills were transferable to the semi-skilled jobs that she indicated he was able to perform, the vocational expert nevertheless identified several unskilled jobs available in significant numbers in the national economy which Connour could perform and which did not require any transferable skills. Specifically, she listed counter attendant (62,890), airline service representative (38,457), messenger (7,298), deli counter attendant (10,485), cashier (126,860), packer (18,704) and housekeeper (41,120). These unskilled positions alone constitute jobs available in significant numbers in the national economy sufficient to satisfy the Commissioner's step five burden. 20 C.F.R. § 404.1568.

Second, the SSA Regulations do not impose an articulation burden on the ALJ to expressly state how the skills acquired by a claimant transfer to the jobs listed by a vocational expert, provided that the acquired skills are articulated. *Id.* at § 404.1568(2). The ALJ questioned the vocational expert regarding the specific

skills Connour had acquired, and the vocational expert replied that she had listed them on a sheet and identified it as Exhibit 10E. (R. 4, Admin. R. at 50, SSA Hr'g Tr.) The skills listed on Exhibit 10E were "[u]nderstanding and following blueprints, sketches and drawing and other written specifications, working to precise measurements, using arithmetic to estimate material amount needed and operating and using various tools." (*Id.* at 134, Past Relevant Work Summ.) It was not necessary for the ALJ to articulate how these skills transferred to each of the semi-skilled jobs that the vocational expert indicated Connour could perform. Rather, the ALJ was entitled to rely on the vocational expert's testimony that Connour's skills did indeed transfer.[5] Therefore, the testimony of the vocational expert satisfied the Commissioner's step five burden, and the ALJ's determination at this step was supported by substantial evidence in the record.

## CONCLUSION

For the reasons contained in this opinion, we must deny Connour's motion for summary judgment. (R. 9–1.) While the Court is generally sympathetic to Connour's medical ailments, our purpose here is not to reach a de novo determination. Instead, we must review the record to ascertain if the ALJ's determinations were supported by substantial evidence. As detailed herein, we have answered this question in the affirmative. Therefore, the Clerk of the Court is directed to enter

judgment, pursuant to Federal Rule of Civil Procedure 58, in favor of Defendant and against Plaintiff.

---

5. Connour cites *Key v. Sullivan*, 925 F.2d 1056 (7th Cir.1991), in which the Seventh Circuit stated that when transferability of skills is at issue, the ALJ must identify work skills acquired by the claimant, and must cite in her decision specific occupations to which those acquired work skills are transferable. *Id.* at 1062 (finding an ALJ's decision insufficient because he failed to identify skills acquired by a plaintiff). In this case, the ALJ did not fail to identify work skills acquired by Connour because she asked the vocational expert to list those skills, and the vocational expert indicated that they were listed on Exhibit 10E. (R. 4, Admin. R. at 50, SSA Hr'g Tr.) Moreover, as noted above, she did not fail to articulate specific, semi-skilled positions to which these skills would transfer. (*Id.* at 21–22, ALJ Decision).